# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80157-CIV-DIMITROULEAS/ROSENBAUM

DENISE LEVY,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of
Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

### *I.   INTRODUCTION*

This matter is before the Court on the cross-motions for summary judgment filed, respectively, by Plaintiff Denise Levy ("Claimant") and by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner").  The motions were referred to me pursuant to 28 U.S.C. § 636 and Magistrate Rule 1(c) and (d), Local Rules of the United States District Court for the Southern District of Florida.  [D.E. 3, 17].

The cross-motions present the following issue: whether substantial evidence exists to support the determination by the Administrative Law Judge ("ALJ") that Claimant is not disabled under the Social Security Act and retains the residual functional capacity to perform a full range of light work and, therefore, to return to her past relevant work as a retail sales clerk.  Under the limited standard of review that governs this case, this Court concludes that substantial evidence does support the ALJ's determination.  Plaintiff's Motion for Summary Judgment [D.E. 18] should be denied,

Defendant's Motion for Summary Judgment [D.E. 24, 25] should be granted, and the Commissioner's decision should be affirmed.

## II. PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits on March 13, 2002, under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§401, *et seq.* (Tr. 75-77, 202-204). Claimant also filed an application for supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§1381, *et seq. Id.* Claimant allegedly became disabled as of July 27, 2001 (Tr. 20, 75, 202), due to lower back surgery and severe depression (Tr. 80), and suffers from a history of asthma. (Tr. 68,167). The Social Security Administration ("SSA" or "Administration") denied the applications initially and upon reconsideration. (Tr. 56-61, 66-68, 200, 205-106).

Thereafter, Claimant requested and was granted a hearing before an ALJ, scheduled for January 7, 2005. (Tr. 9, 72, 50). However, Claimant did not appear at the hearing because she was ill and her attorney requested that the hearing be reset. (Tr. 19, 50, 225). The hearing was rescheduled for February 25, 2005, but Claimant did not attend because she was in jail. (Tr. 19, 44, 225-26). Claimant's counsel appeared for this hearing. *Id.* The hearing was rescheduled for May 19, 2005, and Claimant appeared, accompanied by counsel, and gave testimony before ALJ Thurman Anderson. (Tr. 19, 25, 38, 223-243). At the May 19th hearing, the ALJ left the record open for Claimant's counsel to submit additional medical evidence in response to Claimant's counsel's request and due to the ALJ's direction that Claimant be sent for a psychological evaluation. (Tr. 19, 227, 241-42). The ALJ scheduled another hearing for November 4, 2005, but Claimant requested that the hearing be reset because she was in the hospital. (Tr. 19, 32). The hearing was rescheduled again for December 2, 2005, and neither Claimant nor her counsel appeared for this hearing. (Tr. 219-22). The ALJ based his decision on the record as it existed at the time. (Tr. 19, 26, 219-222).

On December 14, 2005, the ALJ issued a decision finding that Claimant retains the ability to perform the full range of light work, including her past relevant work as a retail sales clerk (as that job is customarily performed in the national economy).  (Tr. 22-23).  Accordingly, the ALJ concluded that Claimant is not under a "disability" as defined in the Social Security Act. (Tr. 23-25).

Claimant later requested review by the Appeals Council of the unfavorable ALJ decision, and she caused additional evidence to be submitted in support of her claim.  (Tr. 8, 210-18).  After considering the additional evidence (Tr. 8), on December 15, 2006, the Appeals Council denied Claimant's request for review, thereby allowing the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 5-8).

On February 20, 2007, Claimant filed this Complaint [D.E. 1] seeking reversal of the Commissioner's final decision and the Commissioner filed an Answer on July 17, 2007.  [D.E. 11]. Claimant filed her Motion for Summary Judgment on September 28, 2007 [D.E. 18], and on October 2, 2007, Claimant filed Exhibit 1 to her Motion as new evidence in support of her Motion [D.E. 21]. The Commissioner filed Defendant's Motion for Summary Judgment on December 5, 2007.  [D.E. 24, 25].  Claimant did not file a reply.  On April 29, 2008, the Court held a hearing on the Motions for Summary Judgment, and all parties presented argument.  [D.E. 28, 29].  Thus, this case is now ripe for decision.

### III.   FACTS

#### A.   General Background

Claimant was born on March 16, 1960, and was 41 years old at the time of the onset of her claimed disability.  (Tr. 228).  She is a graduate of high school, has two years of college, and has relevant work experience as a retail sales clerk.  (Tr. 20, 81, 86, 89, 242).  Claimant alleges that she

has been unable to work since July 27, 2001, due to pain from a fractured left shoulder, lower back

pain, severe depression, and a history of asthma.  (Tr. 80, 88, 97, 99, 102-109, 113, 237-42).

### B.    *Medical Evidence/Treating Physicians*

_____Claimant has been treated and/or evaluated by various doctors.  For simplification of the

medical treatments and diagnoses received by Claimant, the Court will summarize evidence

chronologically and by submission to different levels of the Social Security process.

### 1.    *Evidence Submitted to the ALJ*

In April, 2001, Claimant saw Aris D. Sahagian, M.D., an internal medicine physician.  She

complained of back pain and received an epidural injection[1] and Celexa.[2]  (Tr. 149).  In May, June,

and July, 2001, she again complained of back pain.   (Tr. 154).

Claimant sustained a fracture to her shoulder in August, 2001, after falling in her home (Tr.

121), and she went to the emergency room for treatment.  (Tr. 128).  She saw Gary Wexler, M.D.,

of the Palm Beach Orthopaedic Institute, for evaluation of her left shoulder fracture.  (Tr. 127).  Dr.

Wexler recommended that she begin physical therapy of her shoulder and noted that she was taking

Motrin for pain.  *Id.*  Claimant saw Dr. Wexler again in September, 2001, still complaining of

shoulder pain.  (Tr. 126).  She stated she could not get into physical therapy because she had the flu.

*Id.*  After Claimant advised Dr. Wexler of lower back pain, he ordered an MRI, which revealed a

lumbar[3] disc herniation[4] at L4-5.[5]  *Id.*

---

[1] An epidural injection places anti-inflammatory medicine into the epidural space to
decrease inflammation of the nerve roots, hopefully reducing the pain in the back or legs.  *See*
http://www.spineuniverse.com/displayarticle.php/article1177.html.

[2] Celexa is used to treat depression.  *See* http://www.drugs.com/celexa.html.

[3] The lumbar spine, or low back, is the third major region of the spine. Most people have
five bones or vertebrae in the lumbar spine, although it is not unusual to have six.  Each vertebra

In October, 2001, Claimant returned to see Dr. Wexler, again complaining of pain in her shoulder.  (Tr. 125).  Dr. Wexler's examination showed decreased external rotation strength when Claimant's elbow was at her side, and Dr. Wexler prescribed Voixx.[6]  *Id.*  When she returned later in the same month to Dr. Wexler, Claimant reported an injury to her foot and her right leg spontaneously giving away.  (Tr. 124).  According to Dr. Wexler, the MRI of Claimant's shoulder showed a humeral head fracture[7] and the MRI of her foot showed a fracture.  *Id.*  He also diagnosed radiculopathy.[8]  *Id.*

---

is stacked on top of the other and between each vertebra is a gel-like cushion called a disc (intervertebral). The discs help to absorb pressure, distribute stress, and keep the vertebrae from grinding against each other. *See* http://www.spineuniverse.com/displayarticle.php/article1394.html; http://en.wikipedia.org/wiki/Image:Spinal_column_curvature.png.

    [4] Herniaton of a spinal disc is when a disc pushes outside its normal boundary. Normally, the spinal disc is a soft cushion that sits between each vertabrae of the spine. This spinal disc becomes more rigid with age.  As the spinal disc becomes less elastic, it can rupture. When the disc ruptures, a portion of the spinal disc pushes outside its normal boundary.  This is called a herniated disc.  *See* http://orthopedics.about.com/cs/herniateddisk/a/ruptureddisk.htm.

    [5] Individual vertebrae have names according to region and position, and L4 and L5 are individual names for vertebre located in the lumbar area of spine. *See* http://en.wikipedia.org/wiki/Image:Gray_111_-_Vertebral_column.png; http://www.spineuniverse.com/displayarticle.php/article1396.html.

    [6]  Vioxx is a nonsteroidal anti-inflammatory drug and used to be prescribed to reduce inflamation and pain.  *See*  http://www.drugs.com/vioxx.html.

    [7] A humeral head fracture of the shoulder refers to a fracture of the head of the humerus in the shoulder joint.  *See* http://www.assh.org/Content/NavigationMenu/PatientsPublic/HandConditions/ShoulderFractures/ShoulderFract.htm.

    [8] Radiculopathy is used to describe pain and other symptoms like numbness and tingling in arms and legs caused by problems with a person's nerve roots attached to the spine.  *See* http://www.back.com/symptoms-radiculopathy.html.

Claimant saw Dr. Wexler in November, 2001, and she complained of low back pain with radiculopathy.   (Tr. 123).   Based on his review of x-rays, Dr. Wexler concluded that Claimant's shoulder and foot fractures were resolving and that she had a lumbar herniated disc.  *Id.*

Also, in November, 2001, Clay Baynham, M.D., of Good Samaritan Medical Center, in West Palm Beach, Florida, examined Claimant and completed an Attending Physician's Statement regarding Claimant's back impairment for a private disability claim.  (Tr. 129)  Dr. Baynham diagnosed Claimant with a ruptured disc, based on an MRI and her back pain.  *Id.*  He stated that Claimant could not stand or sit for thirty minutes or more, and she was restricted in her bending, lifting and carrying of objects.  *Id.*   He opined that Claimant suffered from these restrictions since August, 2001, and that it was unknown whether Claimant would be able to return to work at that time.  *Id.*  Additionally, Dr. Baynham stated that he treated Claimant from April, 2001, through November, 2001.  *Id.*

A December, 2001, MRI showed that Claimant had moderate herniated nucleosus pulpsus[9] at L4-5 and mild facet prominence.[10]  (Tr. 139).  There was also a suggestion of an annular tear[11] or small herniation near the left S1[12] nerve root[13] with mild facet prominence.  *Id.*

Claimant underwent lumbar fusion surgery [14] in January, 2002.  (Tr. 130-34, 138).

In April, 2002, a physician's assistant to Dr. Kenneth Lee wrote a letter regarding Claimant's care, stating that Claimant suffered from left shoulder pain secondary to a fracture of the neck.  (Tr. 166).  The physician's assistant also noted that an MRI dated October, 2001, revealed that Claimant

---

[9] A herniated nucleus pulposus is a slipped disc along the spinal cord. The condition occurs when all or part of the soft center of a spinal disc is forced through a weakened part of the disc.  *See*  http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm

[10] The vertebrae are connected to each other with the facet joint structure. Like the other joints in the human body, the facet joint has cartilage lining the joint which reduces friction by allowing the bones to smoothly glide over each other. Along with the cartilage, there is a capsule surrounding the joint and is lubricated by synovial fluid. Support, stability and mobility for the vertebrae are provided by the facet joints.  Facets can become prominent in the spine and be the cause of back pain.  *See* http://www.articleclick.com/Article/What-is-Facet-Disease--And-How-is-Facet-Disease-Diagnosed-/969514 .

[11] The intervertebral disc is composed of an outer capsule, the annulus fibrosis, which surrounds the inner nucleus pulposus. A tear of this capsule, called an annular tear, allows the nucleus pulposus to escape, *i.e.*, the inflammatory contents of the disc to escape,  in some cases producing a visible bulge.  *See* http://www.backpainguide.com/diagnosis.html

[12] S1 is the name of a vertebrae located in the sacrum, or below the lower back.  *See* http://www.spineuniverse.com/displayarticle.php/article1396.html.

[13] This is the nerves that run through the sacral and lumbar levels of the spine. *See* http://www.spine-health.com/Conditions/Pain/Anatomy/Spinal-Cord-And-Spinal-Nerve-Roots.html.

[14] This surgery links together two or more vertebrae in the spine and is performed to eliminate the motion that occurs within that portion of the spine, restore nerve function,  stop abnormal motion, and decrease back pain. *See* http://orthopedics.about.com/od/spinalsurgery/a/fusion.htm; http://www.spineuniverse.com/displayarticle.php/article1562.html.

had degenerative bursitis[15] and tendinopathy[16] of the left shoulder, and that the Claimant suffered

from chronic depression and pain.  *Id.*

Claimant was hospitalized in April, 2002, for dizziness and syncope,[17] and was found to have

episodes of sinus bradycardia.[18]  At that time, she was given Oxycontin[19] for back pain.  (Tr. 164-65).

In August, 2002, Claimant was hospitalized for acute bronchitis and had a secondary diagnosis for

drug withdrawal.  (Tr. 177).

At the request of the SSA, Claimant attended a consultative examination with Carl Spirazza,

M.D., in early November, 2002.  (Tr. 185-91).  Dr. Spirazza noted that Claimant complained of back

pain and that she had a history of depression, migraine headaches, and asthma.  *Id.*  She informed

Dr. Spirazza that she smoked half of a pack of cigarettes a day.  *Id.*  According to Claimant, her

medications at the time included Ibuprofen and an inhaler for her asthma.  *Id.*  Claimant described

her back pain as ranging from a four to ten, out of ten, and constant with exacerbation.  *Id.*  She

stated she drove and was capable of performing activities of daily living.  *Id.*  She also stated that

---

[15] This is inflamation of a bursa, which is a tiny fluid-filled sac that functions as a gliding surface to reduce friction between tissues in the body. With 160 bursae in the human body, major bursae are located adjacent to the tendons near large joints, such as shoulders, elbows, hips and knees.  *See* http://www.medicinenet.com/bursitis/article.htm.

[16] This is an injury to a tendon, which are the tough fibers that connect muscle to bone. Most tendon injuries occur near joints, such as the shoulder.  *See* http://health.yahoo.com/musculoskeletal-overview/tendon-injury-tendinopathy-topic-overview/healthwise--uh2114.html .

[17] Syncope is partial or complete loss of consciousness.  *See* http://www.medterms.com/script/main/art.asp?articlekey=5612.

[18] Bradycardia is a condition to describe slowness of the heartbeat.  *See* http://www.mayoclinic.com/health/bradycardia/DS00947.

[19] Oxycontin is a narcotic pain reliever for moderate to severe pain. *See* http://www.drugs.com/oxycontin.html.

on her best days, she could walk about two hours, sit one hour and then she had to change positions, and on her worst days she just laid flat.  *Id.*  According to Claimant, pain could be influenced by her position changes and medication helped her with the pain.  *Id.*   Claimant described her pain as radiating from her lower back right side to her buttocks.  *Id.*

Dr. Spirazza performed flexion and extension tests for all ranges of Claimant's physical movements and documented his findings.  (Tr. 187-88).  His examination showed Claimant had some limitations involving forward flexion and extension of the lumbar spine, and discomfort in her thigh with straight raising of her right leg that did not radiate to her back.  *Id.*  Her other physical range of motions was not remarkable, and Dr. Spirazza found no other limitations.  *Id.*  Further, Dr. Spirazza concluded that Claimant's manipulative skills were intact, she ambulated without assistive device and without difficulty, and she transferred her weight independently.  *Id.*  He found Claimant to be cooperative and alert, exhibiting no psychotic or neurotic tendencies.  *Id.*  Dr. Spirazza diagnosed Claimant with chronic back pain post surgery and a history of depression and asthma.  *Id.*

A Physical Residual Functional Capacity Assessment was prepared by I.B. Price, M.D., at the request of the SSA, in a non-examining consultative review of Claimant's medical records in late November, 2002.  (Tr. 192-99).   Dr. Price completed his Assessment after Dr. Spirazza's examination of Claimant.  *Id.*  Based on his review of Claimant's medical records, Dr. Price opined that Claimant could lift 20 pounds occasionally, frequently lift 10 pounds, and stand up to six hours in an eight-hour work day.  *Id.*  He further concluded that Claimant had unlimited push and pull ability.  *Id.*  In addition, Dr. Price determined that Claimant had no postural, manipulative, visual, or communicative limitations.  *Id.*  According to Dr. Price, Claimant had some limitation in her ability to be around hazards due to her history of asthma.  *Id.*  Dr. Price also opined that the severity

or duration of the symptoms claimed by Claimant was disproportionate to the expected severity or duration on the basis of her medically determinable impairments. *Id.*

### 2. *Evidence Submitted to the Appeals Council*

Additional evidence that was not before the ALJ was submitted to the Appeals Council. (Tr. 5-8, 11-12). Among such evidence, the Appeals Council in its review of Claimant's application considered the following: a limited lumbar series x-ray ("Lumbar Spine x-ray") dated October 12, 2005, a psychological evaluation dated January 5, 2006, by licensed psychologist Bruce G. Borkosky, and Medical Source Statement of Ability to Do Work-Related Activities (Mental) dated January 5, 2006, also by Dr. Borkosky. (Tr. 211-218).

The Lumbar Spine x-ray found that there was slight levoscoliosis[20] at L4 -5 of Claimant's spine, with sclerotic changes seen at end plates of this disc level. (Tr. 211). There were also two fusion cages seen at L4-5 and L5-S1, and no evidence of acute pathology (*i.e.*, disease). *Id.*

The psychological evaluation by Dr. Borkosky was performed at the request of the SSA after the ALJ noted during the May, 2005, hearing that the record contained no evidence relating to Claimant's mental condition. (Tr. 212-15). During Claimant's interview by the doctor, Claimant stated that she had severe depression because of her back pain over the last five years. *Id.* She also represented that she had a problem with alcohol, opiates and cocaine and that she had last used drugs six months earlier. *Id.* Claimant stated at the time that she used only prescribed opiates. *Id.* According to Claimant, she had not been receiving individual counseling but had been admitted to a mental hospital four to five times. *Id.*

---

[20] Levoscoliosis is a condition where the main curve of the spine is to the left side of the body. Sometimes, but not always, pain is present due to the curvature. *See* http://www.espine.com/glossary.htm ; http://medical-dictionary.thefreedictionary.com/Levoscoliosis.

Dr. Borkosky observed that Claimant had requested that her appointment be rescheduled because she was ill, but when she was told it could not be rescheduled, she arrived on time to her appointment. (Tr. 212-15). Claimant's motor behavior appeared normal and she was in no obvious psychological distress. *Id.* According to Dr. Borkosky, Claimant's speech quantity and quality were normal, and her facial expression was appropriate to the interview. *Id.*

In his assessment of Claimant's mental status, Dr. Borkosky found that she was alert, focused on the interview, and oriented to time and place. *Id.* Her concentration and persistence were fair and her immediate and working memory were normal. *Id.* Her estimated intellectual level was low average and her abstract thinking was intact. *Id.* Dr. Borkosky observed no positive psychotic symptoms, nor did Claimant report any, and Dr. Borkosky estimated Claimant's level of impulse control to be good. *Id.* Based on Dr. Borkosky's evaluation, Claimant's judgment was good and her insight, fair. *Id.* In Dr. Borkosky's assessment of Claimant's personality, he found that she was experiencing distress, she had unusual or unconventional thinking, was moody, unstable and dissatisfied. *Id.* Dr. Borkosky diagnosed Claimant with adjustment disorder and pain disorder, and recommended that she receive therapy and drug and alcohol treatment. *Id.* Additionally, Dr. Borksosky opined that Claimant she was unable to manage her own funds due to potential for drug abuse. *Id.*

On the same day, January 5, 2006, Dr. Borkosky also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Claimant. (Tr. 216-18). In this Statement, Dr. Borkosky indicated that Claimant had no problems in understanding and remembering short, simple instructions, and had slight problems with carrying out short, simple instructions, and understanding and remembering detailed instructions. *Id.* He also found that she had moderate problems with carrying out detailed instructions and with her ability to make judgments on simple

11

work-related decisions.  *Id.*  Dr. Borkosky indicated that Claimant had moderate problems in her ability to interact appropriately with the public, supervisors and co-workers, to respond appropriately to work pressures in a usual work setting, and to changes in a routine work setting.  *Id.*

###### 3.    *Evidence Submitted to the District Court*

On October 2, 2007, Claimant filed as Exhibit 1 to her Motion for Summary Judgment, a letter to the ALJ, dated November 30, 2005, three days before Claimant's second scheduled administrative hearing on December 2, 2005.  This letter read as follows:

> Ms. Levy has a hearing set for December 2, 2005 at 10:00 a.m.. [sic] Ms. Levy's hearing was reset from November 4, 2005, because she was in the hospital on [a] ventilator.  It is my understanding that Ms. Levy was just recently discharged from the hospital after being treated for a ruptured appendix and other complications.

> This case has been reset a number of times in order for Ms. Levy to get medical and psychiatric evaluations, which your Honor ordered after Ms. Levy's original hearing in May of this year.  I have communicated with Stephanie Kremser, a Human Service Program Analyst with the Division of Disability Determinations, who has worked tirelessly to get these medical and psychiatric examinations completed.  She is in the process of rescheduling Ms. Levy's appointments to get you the evaluations you requested.

> I would ask that Ms. Levy's hearing be rescheduled at a time when these doctor's reports are available for your Honor's review.

[D.E. 21, p. 2].  Also included in Exhibit 1 are a facsimile cover sheet dated November 30, 2005, and facsimile confirmation page dated November 30, 2005.  *Id.*

### C.    *Claimant's Testimony Before the ALJ*

On May 19, 2005, Claimant testified before the ALJ.  (Tr. 223-43).  She stated that she was born on March 16, 1960, and as of the date of the hearing, she was 45 years old.  (Tr. 228).  Claimant said she had recently lost her house, was staying with friends, and did not have an address.  *Id.*

She stated she had last worked at Saks Fifth Avenue in July, 2001, or 2002.  (Tr. 242).  According to her testimony, Claimant that she had been released from jail on March 1st of the same year, and she had been in jail for two weeks for possession of Oxycontin.  (Tr. 226-27, 231, 242).

Claimant explained that the problems that caused her to be disabled began in 2002, after a car accident, herniated discs, broken bones, and a fusion surgery. (Tr. 228-29).  According to Claimant, the pain from her fusion surgery affected her lower back, legs, hips, and pelvic area.  *Id.* She claimed that the pain was so bad on some days that there were times she could not walk.  On other days, she said the pain was tolerable.  (Tr. 229-30).  Claimant stated that she sometimes was okay for two weeks and not okay for another two weeks.  *Id.*  She alleged that at times she slept well but also noted that due her to back pain, she screamed in her sleep. (Tr. 238-39).  Claimant testified that she slept about three hours a night.  *Id.*  For pain in her back, Claimant asserted she was taking Ibuprofen and Naprosyn[21] prescribed by "Dr. Guard" and that she was allergic to opiate medicines. (Tr. 231, 240). Claimant testified that did not have health insurance and when she needed to see a doctor, she would see "Dr. Guard" who charged only $30 per visit, or she would go to the emergency room.  (Tr. 235).  According to Claimant, she had been to the emergency room four times for her back pain in the previous few months.  *Id.*

Claimant also testified that she suffered from severe depression as a result of her back pain. (Tr. 231).  She stated that her severe depression immobilized her, and, when she had her house, it caused her not to leave the house.  (Tr. 232).  Because of the depression, Claimant explained, she often cried and spent most of her time alone. (Tr. 237-38).  Allegedly, the depression also caused Claimant not to not to eat and to lose 20 pounds.  *Id.*

---

[21] Naprosyn is an anti-inflammatory drug for conditions such as bursitis and menstrual cramps. *See* http://www.drugs.com/naprosyn.html.

According to Claimant's testimony,  she received treatment for depression from "Dr. Jay Steel" but she stopped seeing him about year ago, as she no longer had health insurance.  (Tr. 232). Claimant said that "Dr. Steel" did not prescribe her any medications for her depression because he was not a medical doctor, but a doctor of psychology.  *Id.*  Claimant noted that she had taken the antidepressant Trazodone[22] for depression  on and off for about a couple of years in the past because "Dr. Steel" told her "medical doctor" to prescribe it to her, but Claimant was unable to identify the name of the medical doctor.   (Tr. 233).

During the hearing, Claimant stated that she did not have any problems with her shoulders. (Tr. 231).  On a good day, Claimant stated, she could sit for approximately 45 minutes before her back pain became too much.  (Tr. 233).  Due to the pain, Claimant alleged that she was best either flat on her back or standing.  *Id.*  On a bad day, she testified she could not sit at all.  *Id.*  According to Claimant,  on some days, she could neither walk nor stand.  (Tr. 233-34).  Claimant believed she could not walk far distances.  *Id.*  She expounded, stating that on a good day, she could walk four blocks, but on a bad day, no blocks at all.  *Id.*  Claimant could reach above her head and straight in front of her, although she stated that she could not lift anything heavy at all because she was afraid she would hurt her back.  *Id.*  She believed she could lift a gallon of milk, but was unsure if she could when her back hurt.  (Tr. 235).   She stated "Dr. Dayhem" told her after her back surgery that when her back pain was bad, she should not lift anything.  *Id.*  According to Claimant's testimony, Claimant could not bend or squat, and could crawl only to a certain degree.  (Tr. 236).

Claimant asserted that when her back was bad, it was impossible to take care of her personal needs.  (Tr. 236).  She said that sometimes she went days without showering.  *Id.*  She also stated

---

[22] Trazodone is used to treat depression and may also be used to treat anxiety and chronic pain. *See* http://www.drugs.com/cdi/trazodone.html.

she had problems with getting dressed, specifically with putting on her pants. (Tr. 236-37). Claimant had no difficulty with putting shoes on because she wore slip-ons. (Tr. 237). According to Claimant, most house cleaning was done by her boyfriend. *Id.* As Claimant explained, on a good day, she cooked but as of the date of the hearing, she was so depressed that she did not bother with cooking meals. *Id.*

Claimant provided her current address and telephone number to the ALJ so that she could be contacted for a consultative psychological examination requested by the ALJ during the hearing. (Tr. 241-42). Claimant also verified that she would also notify the Post Office when she changed her address so that she would receive notices from the SSA. *Id.*

### D.      *The ALJ's Decision*

The ALJ rendered his decision on December 14, 2005. (Tr. 19-25). The ALJ found, in short, that the Claimant did not have a disability as defined under the Social Security Act and was not entitled to disability benefits. In reaching this determination, the ALJ concluded that Claimant's allegations of total disability were not credible and that she had the ability to perform the full range of light work that would enable her to continue to perform her current work as retail sales clerk as that job is generally performed in the national economy. *Id.*

### *IV.   STANDARD OF REVIEW*

In reviewing claims brought under the Social Security Act, this Court's role is a limited one. *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983). The Commissioner's findings of fact must be affirmed if they are supported by "substantial evidence.*" Id.*; *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971). "Substantial evidence" is more than a scintilla of evidence but less than a preponderance and is such relevant evidence that a reasonable person might accept as adequate to support the challenged conclusion. *Id.* at 401, 91 S.Ct. at 1427; *Foote v.*

*Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982).  The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239.  The scope of review is limited to an examination of the record only.  *Reynolds v. Secretary of HHS*, 707 F.2d 927 (6th Cir. 1983).  If the ALJ's decision is supported by substantial evidence, the reviewing court must affirm the decision.  *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards.  *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

## *V.   ANALYSIS*

### *A.     Application of the Sequential Evaluation by the ALJ*

Initially, a claimant has the burden of establishing that he or she is disabled under the Social Security Act.  *Walden*, 672 F.2d at 838;  *Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir. 1991).  A "disability" is defined as an inability . . .

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can
> be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  In determining the merits of a claim for benefits, the court must consider the evidence as a whole, including (1) objective medical facts or clinical findings; 2) diagnoses of examining physicians; 3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other witnesses; and 4) the claimant's age, education, and work history.  *Walden*, 672 F.2d at 839.

*Step One.*  To arrive at a determination as to disability, the ALJ must undertake the five-step sequential evaluation embodied in 20 C.F.R. § 404.1520.  This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  If so, a finding of "no disability" is made.  If the claimant is not engaged in such activity, then the ALJ must proceed to the second step of the sequential evaluation.

Here, the ALJ first determined that Claimant met the disability insured status requirements of the Social Security Act on July 27, 2001, the alleged onset date of her disability, and she continued to meet them through the date of the decision.  (Tr. 19-22).  The Claimant earned $1,721.18 in 2002, which the ALJ held did not rise to the level of "substantial gainful activity."  (Tr. 21).  Since July 27, 2001, the Claimant has not engaged in substantial gainful activity.  *Id.*

*Step Two.*  At the second step, the ALJ must determine whether the claimant suffers from a "severe impairment" or combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  If the ALJ concludes that none of the claimant's impairments are medically severe, the ALJ will consequently find that the claimant is not disabled; if, however, the ALJ concludes that the claimant's impairments are medically severe,  then the ALJ will proceed to the next phase of the analysis.  *Id.*

This ALJ found that Claimant's residuals from a fracture to her left shoulder and lumbar spine surgery, and asthma were a combination of impairments considered severe, based on the evidence of record and the requirements in the Regulations.  (Tr. 22).  He also found that the medical evidence in the record showed, at best, minimal limitations as a result of Claimant's alleged depression and that Claimant had failed to supplement the record with psychological evaluations or

records of treatment.  (Tr. 21-22).  As a result, the ALJ, found that her mental impairment was "not severe."  *Id.*

*Step Three.*  The third step requires the ALJ to consider the "medical severity of [the claimant's] impairments" in order to determine whether the claimant's impairment meets or equals those listed in Appendix I of the Regulations.  20 C.F.R. § 404.1520(d).  Although the list is too voluminous to set forth here, the listings help to identify those claimants whose medical impairments are so severe that it is likely that they would be found disabled, regardless of their vocational background.  *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).  If the ALJ concludes that the impairments meet or equal one of those listed and satisfy the duration requirement, the ALJ will find the claimant disabled without considering age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(iii) & (d).  If not, the inquiry will proceed to the next stage.

In this case, the ALJ determined that Claimant did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 22).  Accordingly, he proceeded to Step Four.

*Step Four.*  This step requires that the ALJ determine whether the claimant has the "residual functional capacity" to perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The Regulations define "residual functional capacity" ("RFC") as what an individual can still do, despite any limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a).  This determination takes into account "all relevant evidence," including the medical evidence, the claimant's own testimony, and the observations of others.  *Id.*  The ALJ must then compare the RFC to the demands of the previous employment to determine whether the claimant is still capable of performing that kind of work.  If so, the ALJ will conclude that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv) & (f).

The ALJ here assessed Claimant's residual functional capacity to perform relevant work and considered Claimant's subjective complaints, but he found that Claimant's allegations regarding her limitations were not entirely credible to the extent alleged.  The ALJ considered all of the medical opinions in the record regarding severity of the Claimant's impairments and determined that Claimant's allegations of total disability were not consistent with the medical evidence in the record. (Tr. 22-25).  Claimant's past relevant job as a retail sales clerk, a position generally performed in the national economy in such a way that it requires "light" exertion,[23] or involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects up to ten pounds, and is typically done indoors and not in proximity to concentrated respiratory irritants.  *Id.*   Based on the Claimant's RFC, with a limitation of not being able to tolerate environmental irritants, th ALJ determined that Claimant could return to her past job as a retail sales clerk.  (Tr. 23-25).  *Id.*  Accordingly, the ALJ concluded that Claimant was not under a "disability," as defined in the Social Security Act.  *Id.*[24]

### B.  *The ALJ's Decision is Supported by Substantial Evidence*

Claimant disputes the findings and conclusions of the ALJ, as well as the Appeals Council's denial of review.  This section addresses the ALJ's decision.

---

[23]   "Light  work" is defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. § 404.1567.  Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs.  A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls.  Social Security Ruling 83-10, 1983 WL 31251, at *5-6 (S.S.A. 1983).

[24]   As the ALJ found she could return to her past relevant work, the ALJ did not need to proceed to *step five* and demonstrate that there exists other substantial gainful employment in the national economy that the Claimant can perform.  *Wolfe v. Chater*, 86 F.3d 1072, 1077 (11th Cir. 1996); *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *Smith v. Schweiker*, 646 F.2d 1075, 1077 (5th Cir. 1981).

Claimant argues that the ALJ erred by failing to develop the record properly and that he made his decision before consultative examinations were completed. She further argues that the ALJ's decision failed to consider all of Claimant's impairments in combination. Finally, Claimant asserts that the ALJ should have found credible her testimony regarding her subjective complaints of pain.

### 1.    The ALJ Properly Developed the Record

Claimant asserts that the ALJ did not fully and fairly develop the record. [D.E. 18, p. 10-13]. In this regard, Claimant argues that the ALJ did not accommodate her by resetting the December 2, 2005, hearing, and that he issued his decision before the consultative mental health examination he had requested had been conducted. More specifically, during the May 19, 2005, hearing, the ALJ left the record open, in part, to allow for the performance of a psychological evaluation of Claimant. Claimant argues that she requested that the last hearing, scheduled for December 2, 2005, be reset due to Claimant's health issues and because the consultative mental examination had not yet been performed. As evidence of this request, Claimant submits a copy of a letter counsel for Claimant sent to the ALJ on November 30, 2005, the accompanying facsimile cover page, and the facsimile confirmation page, but asserts that it was not included in the administrative record. [D.E. 21, Claimant's Exh. 1; *see also* D.E. 18, p.2 n. 1]. Although the letter indicated that Claimant had recently been discharged from the hospital, had not yet undergone the consultative mental examination, and sought to reset the December 2nd hearing, the ALJ did not continue the hearing and instead made a decision based on the record at the time. *Id.*; *see* D.E. 21, Claimant's Exh. 1.

Additional records that are included in the administrative record were submitted to the Appeals Council after the ALJ's decision, including the Lumbar Spine x-ray dated October 12, 2005 (which occurred before the ALJ issued his determination), and the Psychological Examination and Medical Mental Source Statement of Ability to do Work-Related Activities (Mental) completed by

Dr. Borkosky dated January 5, 2006. *Id.*; *see also* Tr. 211-218; 5-8. Claimant contends that the ALJ, in error, denied Claimant's request to continue the hearing and made a decision based on the record at that time "prior to having the[se additional] evaluations that [the ALJ] . . . ordered." *Id.*, p. 12. Because the ALJ erred by failing to develop the record and to consider the additional medical evidence submitted to the Appeals Council, Claimant argues, her case should be remanded to the ALJ with instructions to reconsider Claimant's residual functional capacity in light of these additional records. *Id.*, p. 13.

First, the Court will consider whether the ALJ had a duty to develop the record further. "It is well-established that the ALJ has a basic duty to develop a full and fair record." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also, e.g, Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997) (explaining that a hearing before an ALJ is not an adversarial proceeding). Indeed, the ALJ must develop the facts fully and fairly and probe conscientiously for all the relevant information, even where a claimant is represented by counsel. *See, e.g., Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). Furthermore, in evaluating whether it is necessary to remand, courts are guided by whether the record as a whole "shows the kind of gaps in the evidence necessary to demonstrate prejudice." *Graham*, 129 F.3d at 1423. As such, it is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary to make an informed decision. *See, e.g., Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984); 20 C.F.R. § 404.517.

An ALJ, however, is not required to seek additional independent expert medical testimony before making a disability determination if the record is sufficient and additional expert testimony is unnecessary. *See, e.g., Wilson*, 179 F.3d at 1278. Furthermore, the burden is on the claimant to

prove that she is disabled. 20 C.F.R. § 404.1512(a).[25]  The claimant bears the responsibility to provide medical evidence showing that she has an impairment and to demonstrated just how severe that impairment is during the time she is disabled.  20 C.F.R. § 404.1512(c).[26]  In so doing, a claimant has a duty to cooperate in furnishing the ALJ with or helping the ALJ to obtain available medical or other evidence about his or her impairments.  When a claimant fails to cooperate in obtaining evidence, the ALJ can make a decision based on the information available.  20 C.F.R. § 416.916.[27]

---

[25]   Social Security Regulation 20 C.F.R. § 404.1512(a) reads as follows regarding a claimant's duty:

> . . . In general, you have to prove to use that you are blind or disabled. Therefore, you must bring to our attention everything that shows that you are blind or disabled.  This means that you must furnish the medical and other evidence that we can use to reach conclusions about your medical impairment(s)  . . . material to the determination of whether you are blind or disabled, [and] its effect on your ability to work on a sustained basis.  We will consider only impairment(s) you say you have or about which we receive evidence.

[26]   Part (c) of  20 C.F.R. § 404.1512, states the claimant's responsibility as:

> . . . Your responsibility.  You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled.  You must provide evidence, without redaction, showing how your functioning during the time you say you are disabled, and any other information that we need to decide your claim . . . .

[27]  Pertinent part of 20 C.F.R. § 416.916 reads as follows:

> You . . . must co-operate in furnishing us with, or in helping us, to obtain or identify, available medical or other evidence about your impairment(s).  When you fail to cooperate with us in obtaining evidence, we will have to make a decision based on information available in your case. . . . .

Here, as explained below, Claimant exhibited a pattern of nonchalance about her application. Accordingly, the instant record was sufficiently developed for the ALJ to evaluate Claimant's impairments and functional ability, based on the medical information available in the record at the time the ALJ made his decision, the numerous opportunities provided to Claimant to give testimony regarding her impairments at five different scheduled hearings, the length of time that the record was left open to allow Claimant time to provide evidence of her alleged impairments, Claimant's failure to attend her consultative examination, and Claimant's lack of cooperation in providing evidence of her alleged impairments.

At the time the ALJ made his decision, the administrative record included the timely opinions of Dr. Sahagian, Dr. Wexler, consultative examiner Dr. Spirazza, and non-examining consultative reviewer Dr. Price, as well as various medical records associated with Claimant's impairments after her alleged onset date of July 27, 2001. (Tr. 123-28, 130-34, 138-39, 149, 154, 164-66, 185-99). In addition to Claimant's testimony and her recitation of her ailments in her application filings, as well as the medical evidence available to the ALJ, the ALJ had sufficient evidence to make a detailed finding regarding Claimant's ability to work.

Moreover, Claimant was given five opportunities to attend a hearing in front of the ALJ and granted three requests for rescheduling her hearing (January 7, February 25, and November 4, 2005). (Tr. 19, 32, 44, 50, 225-26).   While the Court would not penalize an individual because circumstances beyond her control may have interfered with a scheduled hearing, in this case, Claimant not only enjoyed resettings of her two hearings over five dates, but also had the opportunity over eleven months from the first scheduled hearing date through the date of the last scheduled hearing to supplement the administrative record with evidence of her disability.

Once Claimant testified at her hearing on May 19, 2005, after twice rescheduling hearings, the ALJ provided Claimant an opportunity for a second administrative hearing and, thus, another opportunity to testify to her alleged impairments on November 4, 2005. (Tr. 19, 32). Claimant again made requests to reschedule her hearing, and the ALJ, for the third time, granted her requests, rescheduling the second hearing for December 2, 2005. (Tr. 219-22, 19). Nonetheless, as noted above, neither Claimant nor her attorney appeared for this December 2nd hearing, despite the lack of any order from the ALJ relieving Claimant of her obligation to do so. *Id.* Each of the notifications to Claimant regarding her five scheduled administrative hearing dates stated the following: "If you do not appear at the hearing [scheduled] and . . . [the ALJ] do[es] not find that you have good cause for failing to appear, [the ALJ] . . . may dismiss your request for hearing. [The ALJ] . . . may do so without giving you further notice." (Tr. 26, 32, 38, 44, 50).

Furthermore, the ALJ gave Claimant ample time to supplement the record to support her impairments with medical evidence, including an 11-month period from the date of her first scheduled hearing on January 7, 2005, through December 2, 2005. (Tr. 19). In fact, at Claimant's May 19th hearing, when counsel informed the ALJ that he was unsure whether the hearing was going to take place on that day and, thus, did not procure all of Claimant's records, the ALJ stated that he would leave the record open for ten additional days in order for Claimant to supplement the administrative record with additional evidence. (Tr. 227). It was at this time that Claimant gave testimony as to her impairments, including an alleged mental impairment. (Tr. 223-41). During this hearing, the ALJ pointed out to Claimant that there was no medical evidence in the record regarding Claimant's alleged mental impairment and that there should be medical evidence to support it. (Tr. 238). As a result, the ALJ also ordered a consultative psychological examination. (Tr. 242). He allowed several months for Claimant to undergo that evaluation before the next scheduled hearing

24

on November 4, 2005.  (Tr. 19, 32).  Claimant, however, did not submit to the examination and instead sought another continuance of the second hearing.  (Tr. 19, 32).  Once again, the ALJ granted the request and reset the second hearing for December 2, 2005.  (Tr. 19, 32).  Neither Claimant nor her counsel appeared.  (Tr. 219-22).  While counsel's November 30th letter to the ALJ indicated that Claimant had *previously* been in the hospital, nothing in the record demonstrated that Claimant was unable to attend the December 2nd hearing, and the ALJ did not excuse attendance.  Throughout this time period from January 7th through December 2, 2005, Claimant had the opportunity to supplement her medical evidence and did not do so with any additional medical evidence, including the consultative psychological examination ordered by the ALJ, the Lumbar Spine x-ray that had been performed in October, 2005 (which she later submitted to the Appeals Council), or any other evidence supporting her alleged mental impairment or any of her other impairments.

The Court also notes that while the ALJ requested and ordered a consultative psychological examination of Claimant regarding her alleged mental impairment, Claimant did not bother to attend her consultative examination until January 5, 2006, after the ALJ had already issued his decision on December 14, 2005, and after her last scheduled hearing on December 5, 2005.  (Tr. 19-25, 212-18). Furthermore, Claimant's attendance at the consultative psychological examination was over six months after her hearing on May 19, 2005, when the ALJ originally requested Claimant attend a consultative psychological examination.  (Tr. 241-42).   It was Claimant's duty to attend the psychological examination prior to the closing of the administrative record, and failure to do so was in direct contradiction of her duty to cooperate in the Social Security application process.  *See* 20 C.F.R. § 404.1512(a) & (c); 20 C.F.R. § 416.916.  As a result, the Court concludes that the lack of the existence of the consultative psychological examination as of the date of the ALJ's decision was the fault of Claimant, not the ALJ.

Moreover, contrary to Claimant's assertions that the ALJ ordered multiple "evaluation*s*" or "examination*s*" [*see* D.E. 18, p. 12,13 (emphasis added)] of Claimant and did not wait for their results prior to his decision, the ALJ ordered only *one* consultative psychological examination, and no others.  (Tr. 241-42).  As noted above, the ALJ waited for nearly six months for Claimant to attend her *one* consultative examination before he made his decision, but Claimant did not submit to the one consultative examination in the six months.  (Tr. 221-22).  The ALJ's inability to consider the one consultative psychological examination he ordered of Claimant did not result from a lack of effort on the part of the ALJ to keep the record open for a sufficiently long period of time.

In fact, the record shows that prior to the ALJ's request for Claimant to attend a psychological examination  at the May, 2005, hearing, Claimant had repeatedly failed to assist the SSA with the submission of medical evidence regarding her alleged impairments and attendance at consultative examinations.  For example, from October to November, 2002, the SSA attempted to request the medical records of "Dr. Jay Steel," whom Claimant alleged she received treatment from for her depression in 2002 and 2004 (Tr. 119, 232), but Claimant submitted no records regarding this treatment into the administrative record.  Moreover, in the SSA's initial Notice of Denial of Benefits dated June 5, 2002, the SSA informed Claimant that she had not gone to a scheduled appointment and did not explain her failure to attend it.  (Tr. 60-63).  And again, in the Notice of Denial of Reconsideration dated December 31, 2002, the SSA informed Claimant that she had failed to attend a medical examination requested by the SSA without a reason.  (Tr. 205-8).

Based on the Court's review of the record, in summary, any gap in the medical record regarding Claimant's alleged mental impairment or any other impairment is not due to the ALJ, but rather, to the Claimant herself.  First, as noted above, although the ALJ worked repeatedly with Claimant to schedule her hearings at times when she could attend, she, nonetheless, failed to appear

at the December, 2005, hearing.  Second, Claimant also repeatedly failed to appear for consultative examinations prior to the administrative hearing level.  Nor did Claimant in the nearly eleven months between the first scheduled hearing date and the last scheduled hearing date cause the record to be supplemented with medical records concerning her mental health, despite Claimant's contentions that she had been under the care of psychologists.  Here, Claimant failed to assist the ALJ in providing appropriate medical information regarding her alleged impairments, pursuant to her duties under the Social Security Regulations.  *See* 20 C.F.R. § 404.1512(a) & (c); 20 C.F.R. § 416.916.  The lack of evidence regarding any alleged medical impairment, physical or mental, was due primarily to Claimant's failure to produce it over an extended period of time.  *See e.g., Ellison*, 355 F.3d at 1276 ("the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim").  The ALJ's good-faith, repeated attempts at development of a full and fair record are supported by substantial evidence and should not be disturbed on appeal.

Claimant also appears to suggest that the ALJ's failure to provide a new hearing date pursuant to Claimant's request on November 30, 2005, to continue the December 2, 2005, hearing, submitted as new evidence as Claimant's Exhibit 1, provides grounds for a remand to the Commissioner.  In this regard, Claimant seems to indicate that Claimant's Exhibit 1 provides good cause for her non-attendance at the December 2, 2005, hearing and that the ALJ's failure to continue the hearing resulted in Clamant's inability to attend her consultative psychological examination in time to be considered properly by the ALJ.  According to the Claimant, and as discussed above, the ALJ's decision not to wait for Claimant to attend the consultative examination with Dr. Borkosky allegedly indicates further evidence of the ALJ's failure to develop the record.

Under Section 405(g), a district court can remand an application for benefits to the Commission by two methods, commonly denominated as "sentence four remands" and "sentence six remands," each of which remedies a different problem.   The Eleventh Circuit recently clarified the standards for these two types of remands in *Ingram v. Commissioner for Social Security*, 496 F.3d 1253 (11th Cir. 2007).

Under sentence six, the relevant portion of 42 U.S.C. § 405(g) provides that a reviewing court has the power to "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence, which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . ." *Id.*  As such, under sentence six, the Court may consider new evidence presented for the first time at the district court level to determine whether it warrants a remand. *Ingram*, 496 F.3d 1253, 1267 (11th Cir. 2007).  "The sixth sentence of § 405(g) plainly describes an entirely different kind of remand [from the fourth sentence], appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of the proceeding." *Ingram*, 496 F.3d at 1267 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)); *see Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991) (the sixth sentence allows the taking of "new evidence . . . that was not available to the claimant at the time of the administrative proceeding.").  As a result, a remand is proper under sentence six when "new material evidence that was not incorporated into the administrative record for good cause comes to the attention of the district court." *Ingram*, 496 F.3d at 1267; *see Milano v. Bowen*, 809 F.2d 763, 766-67 (11th Cir. 1987) (ordering a sentence six remand based on evidence first properly submitted to the district court); *Cherry v. Heckler*, 760 F.2d 1186, 1193-94 (11th Cir. 1985) (same); *Rouse v. Astrue*, 2008 WL 3259549, * 5 (M.D. Fla. Aug. 7, 2008) ("A remand to the Commission is proper under sentence

six only when new and material evidence that was not incorporated into the administrative record comes to the district court's attention.").

According to the Eleventh Circuit, a "sentence six remand is available when evidence not presented to the Commission at any stage of the administrative process requires further review." *Ingram*, 495 F.3d at 1267. "Therefore, the district court does not have the power to remand under sentence six if the new evidence submitted has been considered by the Appeals Council and is part of the administrative record." *Rouse*, 2008 WL 3259549 at * 6.

In order to obtain a sentence six remand on the basis of new evidence, the claimant has the burden of proving (1) there is new, noncumulative evidence, (2) the evidence is material, relevant, and probative so that there is a reasonable possibility that it would change the administrative result, and (3) there is good cause for the failure to submit the evidence at the administrative level. *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986) (citing *Cherry*, 760 F.2d at 1193-94).

After review of Claimant's "new evidence," the Court finds that Claimant's November 30, 2005, letter to the ALJ does not meet the standard for a sentence six remand. In undertaking the *Caulder* analysis, the Court first notes that it is unclear why this letter is not part of Claimant's administrative record, as it appears that it was previously submitted to the ALJ on November 30, 2005. As the letter is dated November 30, 2005, it was created and faxed prior to the ALJ's decision on December 14, 2005, and thus, it is not new.

Putting these issues aside, however, the Court finds there is no reasonable possibility that this new evidence would change the administrative outcome, the test for materiality. *See Caulder v. Bowen*, 791 F.2d at 878. The November 30, 2005, letter presents no further evidence regarding Claimant's alleged impairments that would be relevant to the ALJ's decision regarding whether Claimant suffers from a disability. Nor does it suggest that Claimant was physically incapable of

attending the December 2nd hearing or submitting to the consultative examination prior to that time. Without relevance to her impairments, the evidence is not material to whether the ALJ's decision about whether Claimant is disabled based on the severity of her alleged impairments is supported by substantial evidence, and cannot serve as a basis for a sentence six remand. *See Ingram*, 496 F.3d at 1262-67.

Additionally, contrary to the argument suggested by Claimant, the letter does not provide any evidence that the ALJ failed to develop the record. While Claimant contends that the letter may have provided good cause for her failure to attend the hearing and, thus, her inability to attend her consultative psychological examination before the ALJ issued his decision, review of the letter reveals that it does not represent any specifics about why Claimant was unable to attend the hearing, as she was already released from the hospital. Therefore, based on the information presented in Claimant's letter to the ALJ, it appears Claimant could have attended the December 2, 2005, hearing.

Moreover, Claimant did not offer any information in the letter about why, during the nearly six months between her May 19, 2005, and the date of the letter, November 30, 2005, she was unable to attend her one consultative psychological examination. Nor did she submit any records into the administrative record regarding her admission into the hospital referenced in the letter. Finally, on the day of the December 2nd hearing, neither Claimant nor her attorney appeared, even though the ALJ had not reset the hearing, and the notice of the hearings warned Claimant that if she did not appear for a scheduled hearing without good cause, ALJ could dismiss the case. For all of these reasons, the ALJ had good cause to continue with the December 2, 2005, hearing and to make a finding based on the record at the time. After nearly a year of leaving the record open for Claimant to submit evidence of her impairments, the ALJ did not err in closing the record on December 2nd and issuing his decision, despite the November 30th letter. Accordingly, the ALJ's determination to

30

continue with the December 2nd hearing and not wait for the results of Claimant's consultative mental examination even after Claimant sent the November 30th letter cannot demonstrate that the ALJ improperly failed to develop the record.

Finally, to the extent that Claimant's brief can be read to argue that the Lumbar Spine x-ray and the consultative examination of Dr. Borkosky, including two evaluations of Claimant's mental health, dictate a finding that the ALJ's decision is not supported by substantial evidence, the Court must reject that argument.   The Lumbar Spine x-ray and Dr. Borkosky's examination and consultative medical opinions were not in the record at the time that the ALJ rendered his decision, and the Appeals Council denied review of the ALJ's decision after receiving the records at issue. Accordingly, in determining whether the ALJ's decision was supported by substantial evidence, the Court may not consider the Lumbar Spine x-ray or Dr. Borkosky's examination or consultative medical opinions.  *See Ingram*, 496 F.3d at 1265 (citing *Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998)).  Rather, the Court may review only what was in the record at the time that the ALJ made his decision.  To the extent that Claimant seeks for the Court to consider the Lumbar Spine x-ray and Dr. Borkosky's contributions to the record, the Court must do that in the context of evaluating the Appeals Council's determination to deny review, which requires application of a different standard than whether the ALJ's decision is supported by substantial evidence.  The Court performs this analysis at Section 5.C., *infra*.

### 2.     *ALJ Considered All of Claimant's Impairments in Combination*

Claimant alleges that the ALJ failed to evaluate the combined effects of her limitations. [D.E. 18, p.15-16].  According to Claimant, "had the ALJ had the report[s] of Dr. Borkosk[y], it is clear the ALJ would have considered her mental impairment as severe and given them their proper weight given when determining Ms. Levy's residual functional capacity."  *Id.*, p. 16.  Claimant

claims that the ALJ's failure to consider Claimant's mental impairment in combination with her other impairments was error and should be basis to remand or reverse the ALJ's decision. *Id.*, p. 15-16.

The Court first notes, as discussed above, that the ALJ can review only what is in the record at the time that he makes his decision. Thus, while the Court considers what the ALJ took into account while evaluating the effect of Claimant's impairments in combination, the reports of Dr. Borkosky cannot factor into this analysis, as Dr. Borkosky's reports were not a part of the record at the time that the ALJ made his determination. Rather, as noted previously, any effect of Dr. Borkosky's reports on the propriety of the Commissioner's final determination to deny benefits must be assessed in the context of reviewing the Appeals Council's decision to deny review of the ALJ's determination. With these principles in mind, the Court considers whether the ALJ properly took into account all of Claimant's impairments in combination, as evidence for them existed in the record, at the time that the ALJ rendered his decision.

It is well established that the ALJ must consider the combined effects of Claimant's impairments. *See Davis v. Shalala*, 985 F.2d 528, 533 (11th Cir. 1993); *see also, e.g., Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991) ("Where a claimant has alleged several impairments, the [Commissioner] has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled."). Furthermore, the combination of impairments must be considered when the impairments separately are not severe. *Hudson v. Heckler*, 755 F.2d 781, 785 (11th Cir. 1985). The ALJ must then make specific and well-articulated findings as to the effect of the combination of impairments. *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987). After all, the ALJ must evaluate a disability claimant as a whole

person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis*, 985 F.2d at 534.

A review of the ALJ's decision demonstrates that he considered Claimant's impairments in concert when evaluating her limitations.  First, in discussing the three-step evaluation process that he must perform, the ALJ articulated that severity is established based on "an impairment or combination of impairments."  (Tr. 21).  The ALJ's recognition of this duty, at the very least, evidences consideration of Claimant's impairments in combination. *See, e.g.*, *McKinney v. Barnhart*, No. C 00-2158 MMC, 2002 WL 243605, *5 (N.D. Cal. Feb. 14, 2002) (implicit within the ALJ's finding that claimant's impairment was not of listing level severity was the ALJ's consideration of claimant's combined impairments since he had previously acknowledged that a claimant may establish "a 'severe' impairment or combination of impairments").

Second, the ALJ found that Claimant's residuals from a fracture to her left shoulder, her lumbar spine surgery, and her asthma constituted severe impairments.  He also specifically discussed all references in the record to any mental impairments, as well as noting the conspicuous absence of any such evidence indicating a severe mental limitation, and determined that "[b]ased on the credible evidence of record, there are no more than minimal limitations in the claimant's functioning from a mental impairment."  (Tr. 21-22).  The ALJ then construed all of Claimant's impairments together, along with the record, and determined whether they met, equaled, or functionally equaled any listed impairment, holding particularly that Claimant's "medically determinable impairments, *individually or in combination*, do not meet or medically equal one of the listed impairments . . . ." (Tr. 22, 24) (emphasis added).

Additionally, the ALJ stated that he "must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted with the objective medical evidence and

other evidence. . . ." (Tr. 22). In his findings, the ALJ concluded that Claimant's "medically determinable residuals from a fracture of the left shoulder and from lumbar spine surgery, and asthma do not prevent her from performing her past relevant work." Tr. 24. Thus, it is clear from the ALJ's numerous explicit statements the he considered the combined effect of Claimant's impairments when assessing her limitations and residual functional capacity. *See, e.g., Douglas ex rel Patterson v. Comm'r of Social Security*, 2005 WL 3116634, *1 (11th Cir. Nov. 23, 2005) (finding the ALJ's statement, "claimant's combination of impairments does not meet or medically equal the criteria set forth for any impairment in the listings," clearly meant that the ALJ considered claimant's impairments in combination). Based on the ALJ's review of Claimant's evidence of her impairments, the ALJ correctly held that Claimant could do light work, with some limitations due to her asthma. (Tr. 24).

Third, contrary to Claimant's arguments, the Court finds that ALJ properly considered the evidence in the record at that time regarding any mental health issues alleged by Claimant. (Tr. 21-22). As the ALJ noted in his decision, there was limited evidence in the record regarding Claimant's alleged mental impairment, and none that supporting severe limits on Claimant's mental function. *Id.* The record reflects that the physician's assistant to Dr. Lee noted she was depressed and Claimant also testified she was depressed in her disability reports and at her hearing (Tr. 21-22, 80, 166, 185, 231-33, 237-38), but there is no medical evidence in the record before the ALJ supporting her allegations that her depression severely limited her mental functioning. As concluded above, the ALJ requested such information at the May 19th hearing, by ordering a consultative psychological examination of Claimant. (Tr. 241-42). Yet, after the ALJ kept the record open for supplemental records and waited for months for Claimant to attend the consultative examination, Claimant did not attend nor submit to the ALJ any additional information that would support a limitation on her

mental function. (Tr. 221-22). Based on the lack of objective evidence, the ALJ properly found Claimant's alleged mental impairment to not be severe and found no limitations based on her alleged mental impairment. (RE21-22). As a result, the Court finds the ALJ properly did not consider any mental limitations in weighing the combined effects of Claimant's impairments, and Claimant's argument with respect to this point is without merit.

### 3.    *ALJ Properly Determined Claimant's Credibility*

Next, Claimant contends that the ALJ erred by finding that Claimant's subjective complaints were not credible. [D.E. 18, p.13-15]. Under Claimant's argument, a proper application of the law leads to the conclusion that Claimant is disabled because "Ms. Levy's documented conditions are certainly severe enough to be reasonably expected to cause subjective symptoms which [s]he alleges." *Id.*, p. 14. It is Claimant's position that "objective evidence of an underlying medical condition is not in dispute," and that it "is well documented by the evidence" that Claimant "suffers from residual from a fracture of the left shoulder, status post lumbar fusion, asthma and severe depression . . ." *Id.* From Claimant's perspective, the ALJ rejected Claimant's subjective complaints because she did not have longstanding treatment, even though Claimant testified that she did not have health insurance and could not afford treatment. *Id.*, p. 15. Furthermore, Claimant avers that the ALJ improperly gave great weight to the opinions of a non-examining physician, who opined Claimant could do light work with some environmental limitations. *Id.* Moreover, she claims that the ALJ's residual functional capacity assessment did not consider the "consultative examinations that were performed after the hearing, which substantiated her subjective complaints." *Id.*

According to case law, "pain testimony should be consistent with the degree of pain that could be reasonably expected from a determinable medical abnormality." *Hargis v. Sullivan*, 945

F.2d 1482, 1489 (10th Cir. 1991).  An ALJ is required to apply a three-part pain standard when a claimant attempts to establish disability through pain or other subjective symptoms.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  This standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  *Id.* (citations omitted).  Other possible factors for consideration include the levels of medication and their effectiveness on the Claimant, the extensiveness of the attempts to obtain relief, the frequency of medical contacts, and the nature of daily activities.  *Hargis*, 945 F.2d at 1489.  *See also* 20 CFR Pts. 404.1529 and 416.929.

The ALJ here correctly found that in light of all of the other evidence, Claimant's complaints of disabling pain were not credible.  The ALJ's finding that the objective medical evidence did not support Claimant's subjective complaints is born out by the record in front of the ALJ at the time he made his decision.

According to the medical evidence, Claimant complained of chronic back pain from April, 2001, through December, 2001 (Tr. 123, 129, 149, 154 ), and noted that she had had back surgery in January, 2002.  (Tr. 130-36, 229).  While Claimant avers she continued to have back pain after her surgery, there was no medical evidence demonstrating a medical reason for her complaints of severe back pain.  While a physician's assistant to Dr. Lee noted that Claimant complained of chronic back pain in April, 2002, he relied upon an October, 2001, MRI , which was taken prior to her back surgery.  (Tr. 166).  Furthermore, although Claimant was admitted to the hospital for dizziness and syncope in April, 2002, and complained of chronic pain (Tr. 164), her next medical record in November, 2002, by consultative examiner Dr. Spirazza noted only moderate limitations

and  no significant limitations in her ability to move that would indicate severe back pain.  (Tr. 180-

91).  According to Dr. Spirazza, Claimant ambulated without difficulty and transferred her weight

independently, further demonstrating her abilities for physical movement and negating a conclusion

of severe debilitating back pain.  *Id.*  Similarly, in contrast to Claimant's testimony where she stated

she could not perform any daily activities (Tr. 236-37), Claimant informed Dr. Spirazza that she

drove and was capable of performing activities of daily living.  (Tr. 185).  Dr. Spirazza's findings

were supported by a non-examining consultative review by Dr. Price in late November, 2002.  Dr.

Price, in turn, similarly concluded that Claimant had no physical limitations due to severe back pain.

 (Tr. 192-99).  Significantly, Dr. Price also found that Claimant's symptoms exceeded the evidence

of impairment in the medical record.  *Id.*

        Nor, at the time of the ALJ's decision, were any records in the transcript regarding

Claimant's receipt of regular treatment for her allegedly severe back pain.  Further, while the records

indicated that Claimant received Oxycontin in April, 2002 (Tr. 98, 164-65), by November, 2002 (Tr.

185), and again in May, 2005 (Tr. 231, 240), the records showed she was taking only Ibuprofen, and

the medical doctors had not prescribed narcotics for her alleged pain on a regular basis.  As noted

above, in addition to the objective medical evidence of record, the ALJ appropriately considered the

medications prescribed to Claimant, as well as Claimant's lack of effort to seek medical treatment

for years.  *See, e.g., Hargis*, 945 F.2d at 1489; *see also Watson v. Heckler*, 738 F.2d 1169, 1173

(11th Cir. 1984).

        Additionally, contrary to Claimant's argument, the medical evidence regarding Claimant's

shoulder fracture does not show severe disabling pain.  According to the medical records, in August

of 2001, Dr. Wexler recommended physical therapy and prescribed Motrin, an over-the-counter

medication, for temporary relief of shoulder pain.  (Tr. 21, 127, 128).  One month later, in

September, 2001, Claimant complained that she could not attend physical therapy because she had the flu (Tr. 126), but after this date, as pointed out by the ALJ, there is no evidence that Claimant attempted again or underwent any invasive treatment or long-term therapy program to rehabilitate her shoulder. (Tr. 21). Moreover, Dr. Wexler indicated that Claimant's shoulder fracture was "resolving" in November, 2001. (Tr. 123). This was verified a year later in November, 2002, by Dr. Spirazza's examination of Claimant showing no limitation in her shoulder movement (Tr. 187-88), and Claimant's own testimony at the May 19, 2005, hearing, where she stated that she did not have problems with her shoulders (Tr. 231). Thus, the ALJ appropriately considered Claimant's subjective complaints regarding shoulder pain.

As to Claimant's asthma, the ALJ also took that into account in his decision, even though Claimant as of November, 2002, smoked half a pack of cigarettes daily. (Tr. 23-24). Indeed, the ALJ defined asthma as a limitation causing Claimant not to be able to tolerate environmental irritants, and found that her past relevant work as a retail sales clerk did not expose her to environmental irritants. *Id.* Accordingly, the ALJ properly considered her complaints of asthma.

Regarding Claimant's complaints of debilitating depression, as pointed out above, there are no medical records or opinions to support this alleged impairment or the alleged debilitating effects Claimant testified to at her May, 2005, hearing. As the ALJ stated in his decision, the only medical evidence to support Claimant's contention in this regard consisted of an indication by the physician's assistant to Dr. Lee, and Claimant's own account of a history of depression and treatment by "Dr. Steele" (Tr. 21-22, 80, 166, 185, 231-33, 237-38), but there was no medical treatment evidence to support these assertions. Furthermore, as concluded above, the ALJ's attempts to supplement the record with a psychological examination to support an alleged mental impairment were thwarted by Claimant herself from May 19th through December 14, 2005, the date of the ALJ's decision. Nor

38

did the Claimant supplement the record with her alleged treatment of her depression during this time period, even though she was given ample opportunity. The only medical opinions regarding Claimant's mental impairment, Dr. Borkosky's evaluations, were dated after the ALJ's decision and submitted to the Appeals Council, and, thus, as noted above, must be considered as part of the Court's review of the Appeals Council denial of benefits. As a result, the Court finds that the ALJ appropriately considered Claimant's mental impairment in his decision, based on the medical information before him at the time, as non-severe, and therefore, not supportive of any disabling pain.

While the failure of Claimant to obtain treatment because of a lack of financial resources must not be held against Claimant, in this case Claimant enabled the SSA to obtain records to demonstrate the alleged emergency visits to hospitals for back pain or spontaneous treatment from "Dr. Guard" or treatment by "Dr. Steele" that Claimant testified about in her May, 2005, hearing (Tr. 231-32, 240, 235, 237-38) to support her allegations of severe back pain after her back surgery and depression. But the record at the time of the hearing was devoid of any medical evidence from 2002 through 2005, despite the ALJ's attempts to allow Claimant to supplement the record.

The Court notes that Claimant seems also to suggest that the Lumbar Spine x-ray dated October, 2005, should have been considered by the ALJ and could have substantiated her pain complaints, but as discussed more fully below, the x-ray itself alone does not indicate severe pain by Claimant. (Tr. 211). More significantly, though, the ALJ cannot be faulted for not considering evidence not before him. *See, e.g., Beech*, 100 F. Supp. 2d at 1334. The Court will consider whether the Lumbar Spine x-ray is a basis for remand in its review of the Appeals Council's decision. (*See* Section C).

Further, the Court finds that the ALJ properly discounted the opinion of Dr. Baynham dated November, 2001. (Tr. 23, 129).  While Dr. Baynham asserted that he was Claimant's treating physician and that due to back pain, Claimant could sit for only 30 minutes and not bend, lift or carry objects, his opinion was not properly supported by any medical evidence regarding Claimant's treatment and was completed prior to Claimant's back surgery.  (Tr. 23, 129).  In contrast, consultative examiner Dr. Spirazza's opinion was completed after Claimant's surgery in early November, 2002,  and noted the specific flexion and extension tests Dr. Spirazza performed to evaluate Claimant's physical abilities, including some moderate limitations.  (Tr. 185-91).  This examining assessment was also consistent with the non-examining consultative review of Dr. Price. In this regard, Dr. Price's review, which was dated after Dr. Spirazza's examination, took into consideration all medical evidence in the record at the time to determine properly Claimant's RFC for light exertion work.  (Tr. 192-99).  Furthermore, as detailed above, Claimant failed to attend other consultative examinations set up by the SSA or to provide credible reasons for her failure to attend or supplement the record.  Based on these facts, the Court finds that the ALJ properly discounted Dr. Baynham's opinion.

Thus, based on the evidence before the ALJ, Claimant's complaints that her back pain so severely restricted her ability to walk, stand, or sit, or take care of any of her personal needs, that she is disabled, was not supported by the objective medical evidence in the record.  Because the ALJ articulated explicit and adequate reasons for discrediting Claimant's subjective pain testimony and there is substantial evidence in the record to support that determination, the ALJ's finding cannot be disturbed by this Court.  *Foote*, 67 F.3d at 1562 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986))

### C.     Appeals Council Did Not Err By Upholding the ALJ's Decision

Claimant also disputes the conclusions of the Appeals Council and its denial of review of the ALJ's decision.  [D.E. 18 p. 12-13].   According to Claimant, the Appeals Council erred when it failed to remand the case to the ALJ after the Council received the "new" or additional records of the Lumbar Spine x-ray and Dr. Borkosky's evaluations.  *Id.*   Claimant contends that this "new" or additional evidence "would certainly be relevant and have significant bearing on whether or not Ms. Levy could perform her past relevant work or any other work in the national economy."  [D.E. 18, p. 12].  Further, Claimant argues that "[n]ot only would Dr. Borkosky's findings impact the ALJ's residual functional capacity determination, but it would add Ms. Levy's mental impairments as severe impairments and need to be considered as such." *Id.*, p. 13.  Because the Appeals Council declined to remand the case to the ALJ for a supplemental hearing based on the "new" or additional evidence, Claimant requests that the case be remanded by this Court for an additional hearing based on this "new" evidence.  *Id.*

In contrast to the November 30, 2005, letter considered by the Court earlier in the context of a sentence six remand, the fourth sentence of Section 405(g) provides the basis for the Court's review of the Appeals Council's determinations with respect to the evidence submitted to it after the ALJ rendered his decision.  Title 42, United States Code, Section 405(g) provides the federal court power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing.  When new evidence is submitted for the first time to the Appeals Council, that "new" or additional evidence becomes part of the administrative record.  *Smith v. Social Security Admin.*, 2008 WL 879980, * 11 (11th Cir. April 3, 2008).  Thus,"[w]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether the new [or additional]

41

evidence renders the [Appeals Council's] denial of benefits erroneous [under a sentence four remand]." *Ingram*, 496 F.3d at 1262. "A reviewing court is limited to the certified administrative record in examining the evidence [in a sentence four remand]." *Caulder*,791 F.2d at 875-77. In the court's review, it considers the entire administrative record, including the additional evidence submitted to the Appeals Council. *Ingram*, 496 F.3d at 1262; *Rouse*, 2008 WL 3259549 at * 6; *Barclay v. Comm'r of Social Security*, 2008 WL 649184, * 5 (11th Cir. March 12, 2008).

In a sentence four remand (unlike a sentence six remand), a claimant is not required to make a good cause showing for failure to present the additional evidence at the administrative hearing level in front of the ALJ. *Ingram*, 496 F.3d at 1262 -67; *see also Smith*, 2008 WL 879980 at * 11. Rather, the sole issue before the reviewing court consists of "whether the Appeals Council correctly decided that the 'administrative law judge's action, findings, or conclusion is [not] contrary to the weight of the evidence currently of record.'" *Ingram*, 496 F.3d at 1266-67 (quoting 20 C.F.R. Pt. 404.970(b)); *see also* 20 C.F.R. Pt. 416.1470(b) (a regulation similar to 404.970(b), but concerning review by the Appeals Council of supplemental security income claims).

In this case, the Appeals Council stated that it considered the ALJ's "decision and the additional evidence" of the Lumbar Spine x-ray and Dr. Borkosky's evaluations, but "found no reason under our rules to review the Administrative Law Judge's decision. Therefore, we have denied your request for review." (Tr. 5). In other words, the Appeals Council determined that the ALJ's decision is not contrary to the weight of the evidence in the record, including the October 12, 2005 Lumbar Spine x-ray and Dr. Borkosky's records.

42

With respect to the Lumbar Spine x-ray dated October 12, 2005 (*see* Tr. 211),[28] the Court finds no error in the Appeals Council's determination, as the ALJ's decision is not "contrary to the weight of the evidence" of record, including the Lumbar Spine x-ray within that body of evidence. In fact, the opposite is true; the October 12, 2005, Lumbar Spine x-ray is consistent with the medical evidence already in Claimant's record at the time the ALJ made his decision. More specifically, the x-ray at issue shows fusion at the L4-5 and L-5-S1 disc levels (Tr. 130-34), which the ALJ considered in his decision (Tr. 21-22). While the Lumbar Spine x-ray shows "slight L4-5 levoscoliosis," this does not in itself provide any additional information regarding the severity of Claimant's impairments. Indeed, the use of the descriptive term "slight" indicates that Claimant's levoscoliosis is not severe.

Further, in his decision, the ALJ thoroughly analyzed the evidence in the record regarding Claimant's complaints of back pain and the objective medical evidence regarding Claimant's pain and found that while Claimant's physical impairments were severe, they did not make her disabled. (Tr. 21-22). This x-ray also does not demonstrate a new physical impairment of Claimant or suggest a different level of pain for Claimant, nor does it impose limitations other than those already addressed by the ALJ. *See Higgins v. Astrue*, 2008 WL 818562, * 8 (M.D. Fla. March 25, 2008) (finding new evidence of imaging studies submitted to Appeals Council "do not translate into specific findings or functional limitations;" thus, along with other factors, they do not affect evaluation of claimant's ability to work). It similarly does not conflict with any of the other evidence

---

[28] The Court notes that while Claimant made no specific argument as to how the Lumbar Spine x-ray would have changed the ALJ's decision, Claimant indirectly suggests that "[t]he Appeals Council erred by not remanding the case back to the ALJ after they received the new records" [D.E. 18, p. 12], which includes the Lumbar Spine x-ray. (*See* Tr. 5-8)  Accordingly, the Court will consider the Lumbar Spine x-ray as a basis for a sentence four remand.

of record considered by the ALJ.  Under these circumstances, the Court cannot find that the ALJ's

decision is contrary to the weight of the evidence of record, even including the new Lumbar Spine

x-ray.

Next, the Court considers the additional evidence of Dr. Borkosky's opinions dated January

5, 2006, including a consultative Psychological Evaluation and a Medical Source Statement of

Ability to Do Work-Related Activities (Mental).  (Tr. 212-18).  In reviewing the Appeals Council's

denial of review with respect to this evidence, the Court first notes that both 20 C.F.R. §404.970(b)

(pertaining to disability benefits) and §416.1470(b) (relating to SSI benefits) provide with respect

to decisions based on an application for benefits, "if new and material evidence is submitted, the

Appeals Council shall consider the additional evidence only where it relates to the period on or

before the date of the administrative law judge hearing decision. . . ."  In a recent unpublished

opinion, the Eleventh Circuit recently had occasion to address the operation of this regulation.

More specifically, in *Smith v. Social Security Administration*, 272 Fed. Appx. 789 (11th Cir.

2008),[29] the ALJ issued his decision on December 8, 2005.  In his decision, the ALJ concluded that

the claimant's testimony regarding her depression and anxiety was unsupported by the medical

records, noting that no treating or examining physician had ever reported that the claimant had

disabling depression or any disabling limitations relating to mental impairments.  Four months later,

on April 17, 2006, a doctor performed a consultative examination of the claimant in which he

concluded that she was completely impaired and that she suffered multiple problems with mental

and nervous disorders.  Two months after that, on June 20, 2006, a doctor performed a psychological

evaluation in which he diagnosed the claimant with, among other conditions, major, severe

_____

[29]Under Rule 36-2, U.S. Ct. of App. 11th Cir., unpublished opinions of the Eleventh
Circuit do not constitute binding precedent, but they may be cited as persuasive authority.

depression with possible psychotic features, and opined that her level of impairment would prevent her from functioning in any type of work setting.  The claimant submitted the new evidence to the Appeals Council for consideration.  Although the Appeals Council indicated that it considered the new evidence submitted, it, nonetheless, denied review.  Claimant appealed, and the district court upheld the Appeals Council's determination.  In so doing, the district court noted that while the new evidence might have established that the claimant was disabled as of April 17, 2006, this was not the relevant time period, and any of the records that could establish disability all post-dated the ALJ's decision.

On appeal, the Eleventh Circuit affirmed.  In reaching this conclusion, the Eleventh Circuit relied upon Section 404.970(b)'s limitation on Appeals Council review of new evidence and found that the "because none of the reports in the relevant time period indicated that [the claimant] was experiencing severe or disabling pain or depression, and the reports concluding that she was experiencing severe pain and depression took place after the ALJ's decision, the evidence did not establish a likelihood that the ALJ would have reached a different result, and the ALJ did not err by concluding that the weight of the evidence was not contrary to the ALJ's decision."  272 Fed. Appx. at 802.

The same problem exists in the instant case.  Here, the ALJ issued his determination on December 14, 2005.  Yet Dr. Borkosky's examination did not occur until January 5, 2006, three weeks after the ALJ had made his decision.  Nor is there anything in the Borkosky reports indicating that the conclusions reached therein apply to the applicable time period.  Thus, under Section 404.970(b), Claimant cannot demonstrate that Dr. Borkosky's observations and opinions apply to the relevant time frame.

Moreover, even to the extent that the Court could find that Dr. Borkosky's reports implicitly relate to Claimant's condition at the time that the ALJ issued his determination, *see, e.g., Vega v. Commissioner of Social Security*, 265 F.3d 1214, 1218-19 (11th Cir. 2001) (remanding case for consideration of physician's RFC evaluation made after the ALJ issued his decision but submitted to the Appeals Council as new evidence),[30] the ALJ's decision is not contrary to the weight of the evidence of record, even including Dr. Borkosky's reports.  As noted above, Dr. Borkosky's evaluations identify some slight and moderate limitations in Claimant's mental activities as of January 5, 2006.  (Tr. 212-18).  As defined in the Medical Source Statement, a "slight" limitation means "[t]here is some mild limitation in this area, but the individual can generally function well." (Tr. 216).  A "moderate" limitation means that "[t]here is moderate limitation in this area but the individual is still able to function satisfactorily."  (Tr. 216).

Additionally, Dr. Borkosky's Medical Source Statement indicates that in the absence of Claimant's alcohol and substance abuse problems, Dr. Borkosky would find Claimant's abilities to be "improved," although the extent of such findings was "unknown" to Dr. Borkosky at the time he

---

[30]Relying on *Vega* for this proposition presents problems.  First, as the Eleventh Circuit expressly noted in *Ingram*, 496 F.3d at 1268-69, *Vega* incorrectly considered whether to remand under sentence six (instead of sentence four), even though the court was considering the propriety of the Appeals Council's decision not to grant review of the ALJ's decision based on new evidence submitted to the Appeals Council.  Accordingly, the Court applied sentence six's good cause standard and did not even consider Section 404.970(b)'s test requiring a determination as to whether the ALJ's decision is contrary to the weight of the evidence of record (including the evidence newly presented to the Appeals Council), the standard that governs a court's review of the Appeals Council's denial of review under sentence four.  It is Section 404.970(b) that also contains the restriction on the time period to which newly presented evidence may pertain in order for the Appeals Council to consider it.  Because the *Vega* Court did not mention Section 404.970(b), it is not clear that it directly considered whether the claimant demonstrated that the new evidence submitted to the Appeals Council related back to the proper time period.  Second, as *Ingram* further pointed out, the *Vega* Court remanded the matter to the ALJ, when the law requires a remand to the Commissioner, who returns the case to the Appeals Council, which, in turn, may remand the case to the ALJ.  *Id.* at 1269.

prepared the Medical Source Statement. (Tr. 218). Indeed, Dr. Borkosky found that alcohol and/or substance abuse contributed to "many [and] various" of Claimant's limitations set forth by Dr. Borkosky in his Medical Source Statement. (Tr. 217). More specifically, Dr. Borkosky identified as factors negatively affected by Claimant's alleged alcohol and substance abuse "absenteeism, . . . initiative, . . . emotional functioning, . . . clearer thinking, . . . [and] interpersonal [skills]." *Id.*

In determining the impact of Dr. Borkosky's reports, the Court first notes that while no previous psychological examination exists in the record, the Court has already determined that Claimant's lack of cooperation in the SSA process directly caused this gap. More importantly, however, Dr. Borkosky's evaluations do not point to marked or severe limitations, which could be described as significant, to undermine the weight of the evidence in the record regarding an alleged mental impairment. *See Bolen v. Astrue*, 2008 WL 694712, * (S.D. Ala March 12, 2008) (remanding case where new evidence submitted at Appeals Council "reveal[ed] *significant* bilateral peripheral arterial disease . . . cast[ing] *serious* doubt ALJ's conclusions [regarding claimant's physical abilities] . . .") (emphasis added); *see, e.g., Mitchell v. Apfel*, 1999 WL 33100499, * 3-4 (M.D. Ala. Sept. 17, 1999) (remanding case based on new evidence at district court level, where "evidence of *significant* non-exertional impairments that has a reasonable possibility of leading the ALJ to conclude that plaintiff cannot perform his past relevant work . . .") (emphasis added). Rather, the worst limitations Dr. Borkosky found – moderate limitations – still allow Claimant to function "satisfactorily." That Claimant could function satisfactorily mentally is entirely consistent with the rest of the evidence of record, as that evidence was discussed previously.

Nor do Dr. Borkosky's conclusions suggest the existence of a non-exertional impairment[31] as a result of Claimant's mental impairment, sufficiently significant to preclude a mechanical application of the medical-vocational grids  by an ALJ,[32] as appropriately done in this case.  *See, Cherry*,  960 F.2d at 1193 (remanding case where new evidence submitted to Appeals Council "suggests the existence of a non-exertional impairment *sufficiently significant* to preclude a mechanical application of the medical-vocational grids.") (emphasis added).  Without any indication of a severe or significant mental impairment, the Court does not find that the ALJ's decision is contrary to the weight of the evidence in the record, even including a consideration of Dr. Borkosky's reports.[33]  Accordingly, the additional evidence submitted by Claimant to the Appeals Council does not warrant a remand under sentence *four* of 42 U.S.C. 405(g).

---

[31] Non-exertional limitations are those imposed by a claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and include manipulative impairments of pain.  20 C.F.R. § 404.1569a (a), (c).

[32]  The grids refers to use by the ALJ of the Medical-Vocational Guidelines in matching the claimant's work capacity within the national economy.   20 C.F.R, 404, Subpart. P. App.2., Rule 200.00.  The use of the grids is inappropriate if the non-exertional limitation *significantly* diminishes the claimant's work capacity beyond that caused by her exertional limitations.   20 C.F.R. § 404.1569a (a), (c); 20 C.F.R, 404, Subpart. P. App.2., Rule 200.00(e); *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).

[33]  Even if Claimant's case could be remanded based on Dr. Borkosky's new evidence, and Claimant could somehow be found to be disabled, based on Social Security regulations, the Commissioner would then have to take into account Claimant's alleged substance abuse as a contributing factor material in determining whether she could receive disability benefits.  42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. § 416.935; *Doughty v. Apfel*, 245 F.3d 1273 (11th Cir. 2001).  In this case, Dr. Borkosky specifically opined that Claimant's slight and moderate mental health limitations were made worse by her admitted  substance abuse (Tr. 98, 212), and would be discernibly improved if she refrained from abuse, indicating a likelihood of Claimant's substance abuse as a material factor.  (Tr. 214, 217-18).  Where substance abuse constitutes a material factor contributing to a finding of disability, Section 432(d)(2)(C) precludes a finding of disability entitling a Claimant to benefits.  While the determination regarding the role played by a claimant's substance abuse is for the Commissioner, not the court, to make in the first instance, the Court here finds that Dr. Borkosky's reports cannot provide the basis for remanding the case to the Commissioner and thereby necessitating such an inquiry.

48

## VI.   CONCLUSION & RECOMMENDATION

Claimant had a fair hearing and a full administrative consideration in accordance with the applicable statutes and regulations.  Substantial evidence supports the ALJ's findings as noted in his December 14, 2005, Notice of Decision.  For the foregoing reasons, the undersigned respectfully RECOMMENDS that Plaintiff's Motion for Summary Judgment [D.E. 18] be **DENIED**, that Defendant's Motion for Summary Judgment [D.E. 24, 25] be **GRANTED**, and that the decision of the Commissioner be **AFFIRMED**.

The parties shall have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 25th day of September, 2008.

ROBIN S. ROSENBAUM
United States Magistrate Judge

cc:    Honorable William P. Dimitrouleas
       James S. Elkins, III, Esq.
       Carole M. Fernandez, AUSA